HEDVIG OLSON, Appellee, v. DES MOINES CITY RAILWAY COMPANY, Appellant.

**CARRIERS:** Assisting Passengers to Alight from Car. A carrier, while 1, 5 under no obligation to exercise diligence to discover whether a passenger is in need of assistance in alighting from a car, is, nevertheless, responsible for all damage to the passenger which such assistance would have prevented, when the circumstances *which are apparent to the carrier's employee* are such that he knows, or in reason ought to know, that the passenger is in need of such assistance, and he does not furnish it. Instruction reviewed, and held not prejudicially misleading.

**APPEAL AND ERROR:** Excluded Testimony Otherwise Received. 2 The exclusion of material questions is quite harmless when the witness is otherwise permitted to testify fully to every material fact called for in the excluded question.

**WITNESSES:** Falsus in Uno, Falsus in Omnibus. A statement by 3 a witness in court that, at the time of an injury, he *"saw snow and ice on the car steps,"* and a statement out of court that, at the said time, he *"saw nothing on the step to cause anyone to fall,"* furnish no basis for an instruction that the jury may reject the witness's entire testimony if they find that he willfully testified falsely to any material fact.

**TRIAL:** Belated Objections. Objections to instructions must be 4 disregarded when made for the first time in a motion for a new trial, and without any showing that they were not dis-

covered at the time the instructions were given by the court.

**CARRIERS:**  Assisting Passenger to Alight from Car.
1, 5

**TRIAL:**  Consideration of Extraneous Matter by Jury.  Recitals by
6 a juror of what he personally knew about a witness and his
shortcomings, reviewed, and held not to reveal reversible error.

**TRIAL:**  Impeaching Verdict by Affidavits.  Affidavits are not com-
7 petent to show what discussion was indulged in by the jury
in arriving at the amount of their verdict.

**TRIAL:**  Extraneous Immaterial Matters.  Opinion statements by a
8 juror as to the truthfulness of a certain class of people do not
constitute reversible error.

**TRIAL:**  Quotient Verdicts.  Record reviewed, and held insufficient
9 to establish a quotient verdict.

*Appeal from Polk District Court.*—Thos. A. Guthrie,
Judge.

January 22, 1919.

Rehearing Denied May 21, 1919.

Action to recover damages for personal injury.  Opin-
ion states the facts.  Verdict and judgment for plaintiff in
the court below.  Defendant appeals.—*Affirmed.*

*W. H. McHenry,* for appellant.

*J. L. Gillespie* and *Edwin J. Frisk,* for appellee.

Gaynor, J.—I.   This action is to recover for personal
injuries.

The record discloses that, on the 10th day of Decem-
ber, 1915, the plaintiff boarded a Fair
1. Carriers: as-  Grounds car at East Fifth and Locust
sisting pas-  Streets, and rode to East Thirtieth and
senger to
alight from  Walnut Streets, known on defendant's line
car.  as the Fair Grounds Station.   After the
car had stopped at East Thirtieth Street, the plaintiff at-

tempted to alight, and in making this attempt, fell and was injured. No question is made as to the fact of her fall, the injury, or the extent of it. The defendant contends that her fall was not due to any culpable negligence on its part, and that it is not liable, therefore, for the injuries conse-quent upon such fall.

In her petition, plaintiff charged the defendant com-pany with several acts of negligence as the proximate cause of her injury. Upon the trial, however, on motion of the defendant, all grounds of negligence alleged were with-drawn from the consideration of the jury except the follow-ing:

"First. In allowing the steps of the street car to become slick and slippery, so as to cause one's foot to slip or slide off the step, and in permitting ice to form and accumulate on said car step, so as to make said step slippery and slick and unsafe for ordinary use.

"Second. That the conductor on said car knew, or should have known, of the plaintiff's advanced age and physical condition, and did not aid or assist, or offer to aid or assist her in alighting from said car at said place."

The evidence discloses that plaintiff was about 67 years of age; that, some time in October preceding the accident, she was hurt in her right knee, and her knee was a little stiff and weak. She was, however, able to walk without staff or cane, but limped somewhat. On this particular morning, she walked about six blocks, to reach the point where she took the car. The morning was cold and the ground was hard. She was accompanied by a Miss Wilson. After she boarded the car, she and Miss Wilson took seats in the body of the car. Miss Wilson sat next to the window, and plaintiff on the outside.

The evidence supporting the first proposition is as fol-lows:

Miss Wilson testified that, when the car stopped at

Thirtieth Street, the plaintiff went to the rear door, the door of exit, a little ahead of her; that she saw her on the platform, before she started down the steps; that she saw her turn or go back; that she (Miss Wilson) was then putting on her wraps; that, as she turned around, she saw plaintiff put down her basket; that she was just by the door of exit, ready to go down the steps from the rear platform; that, the next she saw of the plaintiff, she was lying upon the ground.

Plaintiff testifies, touching the manner of her exit, as follows:

"When I started out of the car, I set my basket down on the platform. I stepped down with my right foot. I tried to reach the ground with my left foot. I couldn't reach the ground with my left foot. I had hold of the rod with my right hand. My right foot was on the first step, and my left foot trying to reach the ground. I was hanging onto the rod with my hands. I sat down on the step. I had hold of the rod and held fast, but I couldn't reach the ground, so I tried to hold myself and get up, and then I slipped off, and my hands fell loose from their hold."

She was then asked this question:

"Isn't it true that your right knee gave way and your hold slipped off the rod and you fell in the street? A. Yes. Q. Your right knee gave way because it was weak? A. I slipped. Q. Did your foot give way or your knee give way? A. No, not the knee. Q. Did your knee go over, then, under the weight of your body when you were on the step? A. No, it slipped on the ice. Yes, sir. It slipped, my foot, that way. Q. The reason you fell, then, was because of the ice on the steps, wasn't it? A. Yes, sir. Q. That is the only reason you fell? A. I didn't touch the ground,—my right foot didn't touch the ground. Q. If it hadn't been for the ice, you wouldn't have slipped and fallen? A. I couldn't hold me fast to the rod. Q. If it hadn't been for the ice,

you wouldn't have fallen? A. No. Q. You said, a minute ago, that the cause of your falling was because your foot slipped on the ice on the step? A. Yes, sir. Q. Just put it this way: it was the ice on the step that caused you to fall, wasn't it? A. Yes, sir. Q. You would not have fallen if it had not been for the ice? A. No. Q. You didn't have any knowledge of the ice on the steps of the car until you started to go down the steps? A. When I went on it in the morning, there was, and I knew it would be there when I got out. When I got on the car, I saw the ice there then."

Miss Wilson testified, also, that she noticed the step was icy and dirty, covered with ice and dirt, but the ice was more noticeable.

As tending to support the second proposition, the plaintiff testified:

"I walked from my home to the car on this morning. When I attempted to enter the car, the conductor was standing on the rear platform at the point where I entered. I put my knee on the first step of the car. I knew my knee was weak, and I saw the ice on the step. I lay on the platform and had my hand on the handle, and then I lifted my body up, and Miss Wilson pushed me on."

More specifically, she stated:

"I put my knee on the first step of the car; then I put my left foot where my knee was,—laid my hand on the platform. After I got my right knee and my left foot on the step, then I took hold of the handle or rod with the other hand and pulled myself up. I had one hand on the platform, and Miss Wilson pushed me, and then I stepped up. I know the conductor saw me when I got on the car. When I got out on the platform to alight from the car, I took my little basket with me. I put it down on the platform. The conductor was standing writing on a piece of paper. He was standing on the platform. It was daylight. The conductor did not offer to take my basket. I had my

right hand on the handle and put my right foot on the step and tried to get out and step down. I couldn't reach the ground, so I drew the foot up, and said to the conductor, 'I can't reach the ground;' but he didn't answer me, so I thought I would try, and I still began to go down. Something slipped under my foot, and then I began to go down, and my handbag fell out like this, and I went down there. There was ice and frost and mud on the step. That is why my foot slipped out under. The ice was on the top of the iron step. When my foot slipped, my hand slipped from its hold, and I fell. When I reached down to catch the ground, the left foot hanging down to catch the ground, I couldn't reach it; and the other foot slipped, and then my hand, and I rolled down."

This is the plaintiff's testimony substantially as to how the injury occurred, and the circumstances attending its occurrence.

The conductor testified:

"They (meaning plaintiff and Miss Wilson) were within two or three feet of me when they got on. As I remember it, it was a cold morning and freezing. My eyesight is good. I could see and did see all that was going on there. When they were in the car, they were seated about the middle. When she got on the car, she did not limp, she did not tremble, did not fail for want of strength to step in. I looked at her as I would any ordinary person. Did not notice any weakness about her. She did not ask assistance in getting into the car. There was nothing that I noticed in her manner or conduct as she got on that car that was different from the ordinary person entering a car. I didn't notice Miss Wilson help her on. After she got on the car, she went in the ordinary way out to the Fair Grounds Station. I saw Mrs. Olson alight from the car. She got off on the rear platform. She had a little basket in her hand. I took it away from her, so she could use her

right hand. If I remember right, she had a little shopping
bag in her left hand. She grabbed the rod with her right
hand and stepped down to the step; and just as she was
going from the step down, somehow or other, she went down
in a heap to the ground, and let loose of the rod. I put the
basket down, and jumped out to her. She got off back-
wards, as we call it: I mean by that, she was facing the
opposite way from which the car was going. I didn't see
her slip. I saw the step after she fell. I found no snow or
ice on the step. There was none there. I didn't assist Mrs.
Olson in alighting from the car because people, as a rule,
that are able to get on the car are able to get off. There
was nothing on the step to prevent her from getting down.
I had no knowledge at the time that she needed assistance.
I know Mrs. Olson when I see her. I saw an old man get
off just ahead of Mrs. Olson. When she came out, I was
standing on the inside of the rail on the platform. From
the platform, you go down to what we call a step. There
is only one step hanging from the car, and from this she
stepped down on the ground."

It is apparent, then, that the conductor saw and no-
ticed Mrs. Olson, both when she entered the car and when
she left the car. If her story is true, or the jury should be-
lieve it to be true, as they well might, the conductor must
have seen and known the manner of her entry and the dif-
ficulty that attended it, and the manner of her exit and its
difficulty, and from this should have known her need of as-
sistance. On this the jury might well find that the con-
ductor was negligent in not rendering her assistance, and
that, if he had performed this duty, the injury would not
have happened.

We have set out so much of the evidence, for the pur-
pose of a better understanding of the matters complained
of by the defendant on this appeal. The sufficiency of the
evidence as a whole to sustain the verdict is not challenged.

The errors complained of relate to the making of the record upon which the case was submitted to the jury. Upon the record, the jury found for the plaintiff. Judgment being entered upon the verdict, defendant appeals.

At the conclusion of plaintiff's testimony, the defendant moved to withdraw from the consideration of the jury that issue of negligence involving the failure of the conductor to assist plaintiff in alighting from the car.

It may be stated here that defendant's evidence tends to show that there was no ice or snow upon the step, so that on that issue there was a fact question for the jury.

It is the contention of defendant that plaintiff fell, not from any fault on the part of the company, but through inherent weakness in her knee, and that the fall was due to this weakness, and the manner in which she attempted to alight, knowing this weakness, and not to any fault of the defendant. We do not, therefore, discuss the sufficiency of the evidence to sustain the verdict on the first proposition, for it is not challenged by the defendant.

It is claimed, however, that the court erred in submitting both grounds to the jury; that the court erred, not only in overruling plaintiff's motion to withdraw the second ground, touching the failure of the conductor to assist, but also in submitting that to the jury as an independent ground of negligence, upon which recovery could be had.

If the testimony of the plaintiff and her witness is true, there is good ground for finding, as an independent proposition, that the company was negligent, through its conductor, in failing to render plaintiff assistance as she attempted to alight from the car. Of course, the duty to render assistance in alighting depends upon the circumstances and conditions surrounding the passenger at the time she attempts to alight. The rule, stated broadly, is that it is the duty of the carrier's employees to assist a passenger in alighting from a car whenever the circumstances attending

the passenger are such as to indicate that she requires such assistance. This may be due to the place at which she is required to alight, the unusual dangers and difficulties that attend alighting at the place; or it may be due to the means which are afforded for alighting. It may arise because of the infirm or disabled condition of the passenger, when the employee has knowledge or notice of such condition and the need of such assistance. This is especially true when the assistance is requested. It goes without saying that it is not the duty of the employee of the carrier to exercise diligence to discover the enfeebled condition of a passenger and his inability to alight without assistance. The duty arises only when the circumstances are such as, supposing him to be a reasonably careful, prudent, and intelligent person, to suggest to him the need of such assistance. Whether the evidence suggests such need is for the jury. The duty arises when the need becomes apparent, and not before. As we said in *Mitchell v. Des Moines City R. Co.,* 161 Iowa 100, speaking of the duty to assist a passenger in alighting from a car, the duty arose when it is reasonably apparent to the conductor that assistance is reasonably necessary to enable the passenger to alight in safety.

We do not assume—it is not our province to assume—that a condition existed, or is shown to have existed at the time, such that all men, situated as this conductor was, would have understood and appreciated that there was danger attending the plaintiff in attempting to alight from this car unaided and unassisted; but we do say that her evidence, if true, shows such a state of facts within the knowledge of the conductor at the time that it became a question for the jury to say whether there was danger to the plaintiff in attempting to alight unaided, and whether or not the danger was so reasonably apparent to the defendant's conductor that the conductor, assuming him to be a reasonably prudent and careful man, on whom the duty under the law

rested to render assistance when reasonably necessary, would have seen and understood that there was danger to the plaintiff in attempting to alight without assistance, and whether assistance was reasonably necessary to enable her to alight in safety. As we said in *Mitchell v. Des Moines C. R. Co.,* supra:

"If, to a reasonably careful man, it was reasonably apparent, under the circumstances, that special care should be exercised and assistance rendered, then a duty arose to exercise the care and render the assistance commensurate with that duty, and to render such assistance as appeared reasonably necessary for her safety."

The general rule is that, where the circumstances are such as to suggest the need of assistance, the question as to whether there is dereliction in failing to assist, is for the jury. It is the duty of the carrier, through its employees, to assist a passenger in alighting from a train or car when the circumstances are such as to suggest to the employee the necessity of assistance. *Southern R. Co. v. Reeves,* 116 Ga. 743 (42 S. E. 1015); *Indianapolis T. & T. Co. v. Pressell,* 39 Ind. App. 472 (77 N. E. 357); *McGovern v. Inter Urban R. Co.,* 136 Iowa 13; *Missouri, K. & T. R. Co. v. Buchanan,* 31 Tex. Civ. App. 209 (72 S. W. 96); *Clark v. Traction Co.,* 138 N. C. 77 (107 Am. St. 526).

We are satisfied that there was a fair question for the jury as to the negligence of defendant in respect to the second ground of negligence, and the court did not err in refusing to withdraw it from the jury, and in submitting it to the jury as a basis for recovery.

II. It is next contended that the court erred in sustaining the objection of the plaintiff to the following question propounded to the defendant's witness, the conductor

in charge of the car at the time of the injury, to wit:

2. APPEAL AND ERROR: excluded testimony otherwise received.

"Did anything happen or occur as she (the plaintiff) entered the car which brought to your mind the fact that she needed any assistance?"

We will not stop to discuss whether or not this question is a proper one and should have been answered, for the reason that, immediately preceding this question, this witness was asked:

"Was there anything that you noticed in her manner or conduct as she got into the car that was different from any ordinary person entering a car? A. No, sir. I had no knowledge that she needed any assistance whatever."

He was further permitted to testify:

"When she got on the car, she didn't limp, she didn't tremble, she didn't fail for want of strength to get in. I looked at her as I would any ordinary person; I didn't notice any weakness about her. She didn't ask for assistance."

It follows logically, from the facts to which he testified, that, in his opinion, there was nothing happened or occurred. as she entered the car, that brought to his mind the fact that she needed any assistance. Therefore, if the ruling was erroneous, it was without prejudice to the rights of the defendant. The witness had been permitted to describe to the jury the exact conditions existing, as he claims to have seen them and understood them.

III. It is next contended that the court erred in refusing to submit to the jury certain instructions requested by the defendant.

Complaint is made of the refusal to give Instructions 3, 8, and 9. We will consider only those instructions asked which correctly express the law, and are not covered by the instructions given.

Instruction 9, requested by the defendant, is as follows:

"In determining the weight that should be given to the testimony of any witness, you are instructed that it is your duty to take into consideration the evidence, as disclosed by the record, showing statements made by such witness out of court contrary to the testimony of said witness given in court, and if you are satisfied that any witness has willfully testified falsely to any material fact in this case, you are at liberty to disregard the testimony of such a witness entirely."

3. WITNESSES: *falsus in uno, falsus in omnibus.*

This instruction was asked with reference to the testimony of Miss Wilson. The thought of counsel is that she made statements outside of court contrary to the statements made by her on the witness stand, and from this the jury would be justified in finding that she willfully testified falsely on a material matter in the case. Now it requires no authority to support the statement that it is not the province of the court to submit to the jury, for its determination, any fact which, if found by the jury, would not have support in the evidence. This instruction, if given, would say to the jury:

"You must look to the testimony of Miss Wilson and consider it as given upon the stand. You must look to what she said out of court. If you find she made statements out of court at variance with the statements she made in court, then you will be justified in finding that she willfully testified falsely as to a material matter in the case."

The testimony of Miss Wilson to which this instruction was directed was on a material matter. If there is any ground for a finding that she willfully testified falsely upon a material matter in the case, the instruction should have been given, but not otherwise. The matter in her testimony to which this instruction is directed is that, on the witness stand, she said that she saw snow and ice upon the steps

at the time plaintiff fell. In a statement made by her immediately after the accident, she said she didn't see anything on the step to *cause anyone to fall.* The distinction between the answer given on the trial and the statement made by her outside, is apparent. One is an opinion as to whether or not what she saw on the step, if anything, was such as would cause one to fall. On the trial, she testified as to what she saw on the step. On the trial, she may have entertained the same opinion she had at the time she made her statement touching the sufficiency of what she saw on the step to cause one to fall. She passed down over this step, others passed down over this step, and they did not fall; and it may have been her opinion at the time that the ice and snow she saw on the step were not sufficient to cause one to fall.

Defendant seeks to make her say, out of court, that which contradicts what she said in court, but it does not do so. The two statements may be true. Taking both statements as made, no jury would be justified in saying that, in giving her testimony, she willfully and knowingly testified falsely to a material fact. The fact that the defendant's witnesses testified that there was no snow and ice on the step, would not justify the court in giving this kind of an instruction. Such an instruction would apply as well to the witness of the defendant as it would to the plaintiff, and it would be based upon the contradiction in the testimony; upon the fact that one witness contradicted another. This instruction might be given in every case, if this is the rule contended for. To justify the giving of this instruction, we must find that the jury could have said that Miss Wilson made a statement outside of court of a material fact as of her own knowledge, and that the statement was true, and that, on the stand, she testified to a contrary state of facts, knowing at the time that the facts were not as she said.

The mere opinion that there was not sufficient snow and ice on the step to cause anyone to fall is not a statement that there was no snow and ice upon the step, and, therefore, to submit this instruction to the jury would be to submit to them an ultimate fact to be determined and acted upon, which had no support in the evidence. This is not allowed.

IV.  It is next contended that the court erred in giving its instructions to the jury.

The eighth instruction given by the court is complained of.  It is so framed that a part of it possibly might be misleading, if read alone, but, if read in the light of all the instructions, the jury could not have been misled.  If defendant had deemed it wrong or misleading, and desired it to be corrected,—which could easily have been done before it was read to the jury,—he should have indicated that to the court.  At the time these instructions were given, the following statute was in force (Section 3705-a, Code Supplement, 1913) :

4. TRIAL: belated objections.

"All objections or exceptions thereto must be made before the instructions are read to the jury and *must point out the grounds thereof specifically and with reasonable exactness;* but upon a showing in a motion for a new trial that an error in such instructions was not discovered by the party claiming the error at the time of trial, such objections or exceptions may be made in the same manner in such motion for a new trial and no other objection or exception to the instructions shall be considered by the Supreme Court on appeal.  *  *  *  The objections or exceptions must point out *specifically* the exact grounds thereof, and no other objections or exceptions shall be considered by the trial court upon motion for a new trial or otherwise, or by the Supreme Court upon appeal."

The only objections made by the defendant to the in-

structions before they were read to the jury, are the following: .

"The defendant objects to Instructions 7, 8, and 9 for the reason that these instructions are merely general statements of the law, and are not made applicable to the facts involved in the controversy; the theory of the defendant in this objection being that the court's instructions should apply concretely to the facts involved, and to be determined by the jury. We make the further objection to these instructions, and all the instructions, that they do not correctly apply the law of contributory negligence in this case, to the conduct of the plaintiff, and for the further reason that they do not express to the jury in any way the thought that the Des Moines City Railway Company is not liable for an invisible defect in the plaintiff's tendons of her right leg, which the defendant street car company could not and had not noticed. This thought is involved in the requested instruction No. 8 by the defendant, and the thought is not involved in the instruction as prepared by the court, and for that reason, they are objected to. Defendant further objects for the reason that the thought and purpose involved in Instruction 9 of defendant's request is not given, and the defendant objects because Instruction No. 9 of the defendant is not given, nor anything to take its place."

Instruction 8, referred to in the objections of counsel, reads as follows:

"Ordinarily, there is no duty resting upon the employees of the street railway company to assist passengers in getting on and alighting from its cars, but such duty may exist in particular cases. As applied to this case, if the condition of the plaintiff, at the time in question, was such as to make it reasonably apparent to the conductor in charge of said car that she needed assistance or unusual care in attempting to alight from said car, the duty of the defendant towards her, while alighting or attempting to

alight from said car, must be performed with due regard to such apparent condition, *of which said conductor knew, or which, in the exercise of reasonable and ordinary care upon his part, should have known at such time.* Whether it was the duty of the defendant's conductor to have assisted the plaintiff in alighting from said car is a question for you to determine from all the evidence in the case; and to that end it is proper for you to consider, as shown by the evidence, her appearance, condition, and physical infirmities, if any; her manner, conduct, and ability to alight from said car without assistance; her need of assistance, if any; whether or not beneficial assistance could reasonably have been rendered her at said time; and all the facts and circumstances disclosed by the evidence, *all of said facts existing and were known, or should have been known, to the conductor of said car in the exercise of reasonable and ordinary care upon his part, for the safety and protection of the plaintiff at said time.* If you find from the evidence, under these instructions, that it was the duty of the defendant, through its employees, to have assisted plaintiff in alighting from said car at said time, then you will be warranted in finding that the failure of the conductor to perform said duty at said time constituted negligence upon the part of the defendant."

The objection urged at this time is to the italicized portions of this instruction. We find nothing in the exceptions or objections urged, before the reading of these instructions, which touches the matter complained of, and no showing is made in the motion for a new trial that these matters were not discovered before the instructions were read. This instruction indicates to the jury that, before the company can be liable for failure to render assistance, before the duty to assist arises, the condition of plaintiff must be such as to make it reasonably apparent to the conductor in charge of the car that she needed

5. CARRIERS: assisting passenger to alight from car.

assistance; that the duty to assist her while she was alight-
ing, or attempting to alight, must be performed with due
regard to such apparent condition. The part complained
of is what follows: "Of which said conductor knew, or
*which in the exercise of reasonable and ordinary care on
his part he should have known at such time."* The first part
of this instruction states unquestionably the true rule.
The last part of the italicized portion in the second para-
graph of this instruction can hardly be justified under the
rules as we understand them. However, if the condition
of the plaintiff was such that it was apparent that she need-
ed assistance, or if, from her apparent condition, he knew
that she needed assistance, or if, from her apparent condi-
tion, he should have known that she needed assistance, in
the exercise of reasonable and ordinary care for the safety
of the passengers entrusted to him, then his duty to render
assistance began. This does not mean that he must dili-
gently inquire as to the physical condition of his passen-
gers, to ascertain whether they need assistance in alighting
from the car; but it does mean that, if the condition of the
passenger is such as to make it reasonably apparent to the
conductor that she needs assistance, or if her apparent con-
dition is such that, had he given the matter reasonable care
and consideration, he should and would have known that
assistance was necessary, then he was negligent in not ren-
dering assistance. The court in this instruction directed
the attention of the jury to the evidence tending to show
her appearance, condition, and physical deformities, man-
ner and conduct and ability to alight without assistance,
and then should have said:

"If, from this, the conductor knew, or, by the exercise of
reasonable and ordinary care, should have known, the fact
that she needed assistance, then it was his duty to render
assistance."

We are not saying that this instruction meets with

our approval, but we are saying that, in the light of the record made here, it could not have been misleading to the jury, and we further say that the objections now urged to the instruction do not serve as a basis for reversal, for the reason that they were not specifically made before the instructions were read to the jury, and no showing was made in the motion for a new trial that they were not discovered and known to the defendant as well then as they are known now; and, not having called the court's attention specifically to the errors now complained of, the defendant is not in a position to urge them here. This is true as to all objections urged to instructions given. This court will not consider errors in instructions when the errors complained of were not pointed out to the district judge specifically and with exactness before the instructions were read to the jury, as required by the statute. Cases have been reversed in this court for errors which would not have been committed if counsel had specifically, definitely, and with exactness, called the court's attention to errors in the instructions before they were read, so that the court could have avoided the error, and stated the law correctly. It is the duty of counsel to aid the court in advising the jury as to what the law is. At least, it is the duty of counsel to call the court's attention to errors in its instructions of which complaint may be made, on counsel's theory of the case. This might be a harsh rule, if it were not for the fact that, in the motion for a new trial, counsel is permitted to make a showing that he overlooked the error at the time. He may then specifically and definitely call the court's attention to the errors of which he complains. The court may then correct its own errors by granting a new trial, thereby avoiding the expense and trouble of coming to this court for its correction. Counsel undoubtedly have prepared the case for trial before it reaches a point when the court is called upon to instruct the jury. Counsel has

then informed himself, or should have informed himself, of what the law is, or, at least, what he claims it to be. He is then given the opportunity to call the court's attention specifically, definitely, and with exactness, to the errors in the court's instructions. If he fails to do this, and the case goes against him, he must forever after hold his peace. *State v. Collins,* 178 Iowa 73; *In re Estate of Rule,* 178 Iowa 184; *Hanson v. City of Anamosa,* 177 Iowa 101; *Gilman v. McDaniels,* 177 Iowa 76; *Joyner v. Interurban R. Co.,* 172 Iowa 727; *Pettermann v. City of Burlington,* 170 Iowa 555.

It is true that, in a motion for a new trial, the defendant may urge his objections to the instructions, and in this case, counsel did urge, with some degree of exactness and specification, the errors of which he now complains; but there is no showing, in this motion for a new trial, that counsel was not as cognizant of these errors at the time the instructions were read, as he was when he prepared his motion for a new trial. He does not even state that he did not discover these errors. We have held that a mere statement that the errors were not discovered before the instructions were read is not sufficient. There must be a showing that the errors were not discovered. As bearing upon this point, see *Chumbley v. Courtney,* 181 Iowa 482; *Dimond v. Peace River L. & D. Co.,* 182 Iowa 400; *Eley v. Chicago G. W. R. Co.,* 186 Iowa —.

It is next contended that there was misconduct on the part of the jury in deliberating upon their verdict. There is an attempt to show this misconduct by affidavit. The affidavits filed in support of this contention were, in a measure, contradicted by counter affidavits; or, at least, the counter affidavits furnish an antidote to much of the poison. The matter complained of, as stated in the motion for a new trial, is that a juror, while deliberating, said to

6. TRIAL: consideration of extraneous matter by jury.

his fellows that he had ridden with the conductor in charge of this car many times; that the conductor was an over-important man; that he was indifferent; that he never, at any time, offered any assistance to passengers in entering or alighting from the car.

Second, that the jury gave the plaintiff a verdict largely in excess of the damages which they found she sustained, on the theory that the plaintiff would have to pay her attorney; that on this theory the jury allowed plaintiff double what they thought she was entitled to recover.

Third, that the same juror, Moreland, said to the jury, while deliberating, that the plaintiff was a Swede, and that he had known Swedes, and they were much more truthful and reliable than other people, and, therefore, that they should give greater weight to her testimony because she was a Swede.

Fourth, that the verdict is a quotient verdict.

Moreland testified, upon the first proposition:

"I think I made the casual remark that I had seen this conductor before, and had never noticed him help anyone on or off the car; but I never said, in substance or otherwise, that I had ever seen him when he should have helped anyone off."

All the jurors who gave affidavits in support of the new trial filed counter affidavits, except the witness Hulderson. Hulderson testified that Moreland said to the jury, while deliberating, that he had ridden many times before with this conductor, and that he was always important and discourteous, and neglected to help passengers; and said that he also knew the Swedes, and that they were more honest than the Americans. It was also talked and suggested by several to add $2,500 to what they had talked about giving plaintiff, in order that she might have some money left, after paying her attorney.

None of these witnesses testified that Moreland ever

said that he saw this conductor refuse or neglect to assist anyone to alight from the car who appeared to him to be in need of assistance. The mere statement that he never saw this conductor assist anyone to alight from the car, without the further statement that he saw anyone on the car of which this conductor had charge, who was in need of assistance, and who was refused assistance by this conductor, is not prejudicial.

In the case at bar, there is no attempt to show that this conductor assisted this plaintiff. The fact is disclosed by all the evidence that he neither assisted nor attempted to assist her. Moreland, in his counter affidavit, said that he never said or sought to convey to the jury the idea that he ever saw this conductor refuse to assist one who apparently needed assistance. The jury must be recognized as possessing some intelligent discrimination. The statement made by this person could not have conveyed an impression further than the words themselves conveyed: that he had never seen this conductor assist anyone, or offer to assist anyone, in alighting from the car. Each might have said he had never seen any conductor assist a passenger in alighting from a car. The need of assistance is the exception, and rarely occurs. If this juror had said that he had seen this conductor refuse or neglect to assist one who needed assistance, or asked assistance, a very different question would be presented, and the statement might be prejudicial; but the mere statement that he had never seen him assist or attempt to assist anyone, is meaningless, so far as the issues in this case are concerned, and could not have influenced the jury to the prejudice of the defendant, under the issues here.

It is next contended that the jury gave a verdict much in excess of what they found plaintiff entitled to, on the theory that she would have to pay her attorney.

The most that the affidavits show on this point is that

7. TRIAL: impeaching verdict by affidavits.

the fact that she would have to pay her attorney was discussed. That it was considered in the making up of the verdict, is not proven. Moreland testified:

"No other sum than that presented in the verdict was ever agreed upon by the jury as measuring plaintiff's damage."

Chrisinger, a member of the jury, says:

"It was not long after we retired that we all agreed that plaintiff was entitled to a verdict; but, like most cases, there was a difference of opinion as to how much she would be entitled to, some of the jurors wanting to give her the amount stated in the verdict, while some thought the damages would be less. We finally agreed that the verdict should be as returned."

Fry, a juror, testified:

"As was natural in such a case, some of the jurors wished to give more than we returned, and some to give less. Our final verdict was arrived at by all agreeing that the amount returned should be the verdict. Any statements made about attorney's fees were considered as casual statements."

Juror King testified:

"The final verdict was arrived at and agreed upon as being the sum which the plaintiff was justly entitled to, in view of the evidence. The matter of attorney's fees was not talked of until after the amount of the verdict was arrived at."

Juror Spencer affirmed:

"Our final verdict was arrived at by all the jurors agreeing finally that the sum awarded represented the damage done plaintiff. As was natural in all cases, some jurors wished to give more and others less, but we finally arrived at $4,500 as the amount plaintiff was entitled to."

Juror McGahan affirms:

"It was not long after we retired that we agreed that plaintiff was entitled to a verdict, but, like most cases, there was a difference of opinion as to how much she would be entitled to. Some of the jurors wanted to give more than the amount returned, while others thought the damage was less. We finally agreed upon $4,500."

Some of the affiants, in their original affidavits, stated that the jury allowed the plaintiff, in addition to the actual damage sustained by her, attorney's fees, and estimated that, after her attorney's fees were paid, she would have $1,200 or $1,500 for her damages; but these same jurors, in their counter affidavits, recede from those statements. However, we think that any discussion that took place in the jury room as to the amount that should be allowed, was a matter that inhered in the verdict, and cannot be shown in this method, to impeach the verdict. *Porter v. Whitlock,* 142 Iowa 66, and cases therein cited.

The third claim, that Moreland said that plaintiff was a Swede, and that he knew Swedes, and that they were more honest than Americans, does not disclose such prejudicial conduct on the part of the juror as 8. TRIAL: extraneous immaterial matters. would justify us in reversing the case. It was the mere opinion of the juror. That this opinion could influence the other jurors, is not believable. It was a casual remark by the juror. It may have expressed his opinion. The jurors were the sole judges of the credibility of the witnesses, and the weight to be given to their testimony. Moreland himself does not say he was influenced, or that he considered this fact in making up his verdict. In his affidavit filed, he says:

"Any remarks made by me in regard to the Swedish people were not considered by me in making up my verdict. I have always known, and of course considered, that the case was to be decided upon the evidence received in open court, and I considered only such evidence."

The affidavits of all the jurors show that they under-stood that they could not find that the conductor was bound to help or assist Mrs. Olson, unless they first found that the conductor knew, or should have known from apparent con-ditions, that she needed help, and all the affidavits negative the idea they gave any special credence to the testimony of Mrs. Olson because she was a Swede.

It is next contended that the verdict arrived at was a quotient verdict.

If we take the affidavits filed by the defendant, in at-tacking the verdict, we might say that this is true; but a consideration of the counter affidavits by the same jurors satisfies us that it is not true. The counter affidavits show that, at no time in the deliberation of the jury, did they agree in advance to abide by any quotient verdict, to be arrived at by adding the sums which the different jurors thought the plaintiff should receive, and dividing it by twelve. It is true that each juror did write down the sum that he thought plaintiff was entitled to, and it was divided by twelve; but the sum so obtained was not agreed upon as the verdict. King, who made an original affidavit from which it might be claimed the quotient verdict was arrived at, in a counter affidavit said:

9. TRIAL: quotient verdicts.

"The matter of a quotient verdict was talked of as be-ing improper and unlawful. At no time did I, or any other juror, agree to abide by any such a quotient verdict. The final verdict was arrived at and agreed upon as being the sum plaintiff was justly entitled to, in view of the evidence."

We find no reversible error in the case, and the cause is—*Affirmed*.

LADD, C. J., PRESTON and STEVENS, JJ., concur.